**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

KIM SNYDER, *on behalf of herself and all*
*others similarly situated,*

                Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., et al.,

                Defendants.

Civil No. 21-1049 (JRT/DJF)

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN**
**PART DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

---

Brent Hannafan, David McNamee, Kevin H. Sharp, and Leigh Anne St Charles, **SANFORD HEISLER SHARP, LLP,** 611 Commerce Street, Suite 3100, Nashville, TN 37023; Charles Henry Field, Jr., **SANFORD HEISLER SHARP, LLP,** 7911 Herschel Avenue, Suite 300, La Jolla, CA 92037; David Sanford, **SANFORD HEISLER SHARP, LLP,** 1666 Connecticut Avenue Northwest, Suite 300, Washington, DC 20009; and Susan M. Coler, **HALUNEN LAW**, 1650 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Plaintiffs.

Craig S. Primis and Kenneth Winn Allen, **KIRKLAND & ELLIS LLP,** 1301 Pennsylvania Avenue Northwest, Washington, DC 20004; Madelyn Morris, **KIRKLAND & ELLIS LLP,** 601 Lexington Avenue, New York, NY 10022; and Deborah A. Ellingboe and Drew Horwood, **FAEGRE DRINKER BIDDLE REATH LLP,** 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for Defendants.

Because a reasonable trier of fact could easily find that Plaintiff Kim Snyder caught

Defendant UnitedHealth Group, Inc. ("United")[1] with its hand in the cookie jar, the Court

---

[1] For the most part, there is no meaningful difference between the various United Defendants for purposes of this order. The Court will treat them collectively except as specified in the last section of this order.

will substantially deny United's motion for summary judgment. There are genuine disputes of material fact as to whether United breached its duties of prudence and loyalty under the Employee Retirement Income Security Act ("ERISA") by investing its employees' 401(k) savings in underperforming Wells Fargo ("Wells") funds for more than a decade and allowing United's business relationship with Wells to influence that allegedly imprudent retention. There is also a genuine dispute as to whether Wells's fees were reasonable, and thus whether United engaged in a prohibited transaction. And because the evidence, when viewed in the light most favorable to Snyder, establishes United's President David S. Wichmann was a functional fiduciary, the Court will maintain Wichmann as a defendant in this action.

The Court will grant United's motion only as to Count II because United did not breach any enforceable provision of its Investment Policy Statement ("IPS"). The Court will also dismiss United's Board of Directors, collectively and individually, as defendants in this action because they were neither functional fiduciaries nor did they have a duty to monitor the 401(k) fund.

**BACKGROUND**

I.   **FACTS**

United's 401(k) savings plan ("the Plan") serves more than 200,000 current and former employees, with around $15 billion under management. (Order Den. Defs.' Mot. Dismiss ("MTD Order") at 2–3, Dec. 2, 2021, Docket No. 96.) A Wells Target Date Fund ("TDF") served as the default investment option during the class period. (*Id.* at 3.) A TDF

bases investments and sorts the employee savings into different "vintages" based on the employee's anticipated retirement date. (*Id.* at 3; Defs.' Mot. Summ. J. ("Defs.' MSJ"), Ex. 1 ("Chalmers Rpt.") ¶ 22, Aug. 11, 2023, Docket No. 173.) The vintages employ "glidepaths," reducing investment risk as their constituents' retirement dates near. (*Id.* ¶ 23.)

### A.    Pre-Class Plan

This action only covers Plan matters beginning after April 23, 2015. (Am. Compl. ¶ 146, Aug. 24, 2022, Docket No. 119.) Nonetheless, the state of affairs before the class period provides essential context for allegations thereafter.

### 1.    Management

From before the class period began until February 2016, the Plan was overseen by United's Executive Vice President of Human Capital, Ellen Wilson. (Defs.' MSJ, Ex. 2 ("Minahan Rpt.") ¶¶ 24–25, Aug. 11, 2023, Docket No. 173-1.) Though Wilson was the primary fiduciary, she solicited advice from and delegated tasks to an Investment Review Committee ("IRC"). (*Id.*) United also adopted an IPS to outline certain policies and objectives of the Plan. (*Id.*, Ex. 83 ("IPS"), Docket No. 173-73.)

United depicts Wilson as a prudent yet humble fiduciary who understood her limits. Much of the work fell to the IRC, which would meet quarterly. (Minahan Rept. ¶ 69.) Wilson and the IRC were also advised by an outside consulting company, Mercer. (*Id.* ¶¶ 70–73.)

What United views as a humble management style, Snyder views as "disengaged." (Pls.' Mem. Opp. Summ. J. ("Opp."), Ex. 1 ("Stone Rpt.") ¶ 76, Sept. 1, 2023, Docket No. 179-1.)  Wilson was unable to later recall that it was her responsibility to select and remove investment options.  (*Id.*, Ex. 43 at 3–4, Sept. 1, 2023, Docket No. 179-38.)  And she rarely attended quarterly meetings with the IRC and Mercer.  (*See generally id.*, Exs. 54–55, Sept. 1, 2023, Docket Nos. 179-47, 179-48 (noting Wilson's attendance at just one meeting between 2014 and 2015).)

### 2.    Investments

The Wells TDF became the default investment for Plan participants in 2010.  (Defs.' Mem. Supp. Summ. J. at 16, Aug. 11, 2023, Docket No. 170; Opp. at 9.)  The parties refer to this original Wells TDF as the equal weighted TDF, as compared to the post-2017 factor enhanced TDF.  The equal weighted TDF was conservative across all vintages, adopting a lower-risk, lower-reward investment approach.  (Chalmers Rpt. ¶¶ 54–55.)  Although the equal weighted TDF was not as lucrative as more aggressive peer TDFs, United's expert maintains that Wells performed above median amongst its peers when accounting for risk.  (*Id.* ¶ 83.)

Snyder's expert believes United's risk analysis suffers from tunnel vision, though. The equal weighted TDFs primarily guarded against short-term volatility, ignoring other

potential risks.[2]  (Defs.' MSJ, Ex. 18 at 8, 10, Aug. 11, 2023, Docket No. 173-16.)  All the

while, Snyder's expert asserts peer funds would have generated hundreds of millions of

dollars of additional investment profit, making Wells an inferior investor.  (Opp., Ex. 3

¶¶ 40–41, Sept. 1, 2023, Docket No. 179-3.)

Mercer's quarterly reports from before and after the class period show Wells's

chronic underperformance.  (*Id.*, Ex. 5, Sept. 1, 2023, Docket No. 179-5.)  By 2020, every

vintage's one-, three-, five- and ten-year performance ranked in the bottom quartile of

the peer universe, at least as measured by absolute returns.  (*Id.* at 10; *see also* MTD

Order at 4–6.)

### 3.    Mercer's Intervention

In October 2014, Mercer recommended United "evaluate alternative products

available in the marketplace."  (Defs.' MSJ, Ex. 42 at 3, Aug. 11, 2023, Docket No. 173-

38.)[3]  And in April 2015, just before the beginning of the class period, Mercer offered a

suggested workplan, beginning with an eight-month period for Mercer to research

alternatives.  (*Id.*, Ex. 43 at 3–4, Aug. 11, 2023, Docket No. 173-39.)

_____

[2] Including longevity risk, the risk of running out of assets; unsystematic risk, the risk of deviating from the market; and concentration risk—Mercer advised that a single plan should constitute no more than twenty percent of a manger's assets, while United's Plan constituted eighty percent of Wells's TDF business.  (Opp., Ex. 2 ¶¶ 65–67, 84–85, Ex. 4 ¶ 17, Sept. 1, 2023, Docket Nos. 179-2, 179-4.)

[3] Snyder's expert claims this language would be understood in the industry as a clear and urgent recommendation to replace Wells.  (Opp., Ex. 22 at 16–18, Sept. 5, 2023, Docket No. 185; Stone Rpt. ¶ 88.)  United alleges this interpretation is unsupported but does not move to exclude this expert testimony.

\*     \*     \*

So where do we stand at the start of the class period?  That depends on who you ask.  According to United, Wilson, as sole fiduciary, was tuned in but appropriately deferring to the experts.  A search for a new TDF provider was ramping up, but in the meantime, Wells's risk-adjusted returns were acceptable.  And Snyder's assessment?  According to her expert, a prudent fiduciary would have parted ways with Wells before the class period in this action even began.  (*See, e.g.*, Stone Rpt. ¶ 83.)

**B.    Class Period**

In 2015, Mercer presented several analyses showing comparator funds were superior to Wells.  (*See, e.g.*, Opp., Ex. 31 at 21, Docket No. 179-27.)

Meanwhile, as the search process was heating up, United rearranged the oversight structure for the Plan.  Rather than acting as the sole fiduciary, Wilson appointed an Investment Committee ("the Committee") to act as named fiduciaries.  (Defs.' MSJ, Ex. 5, Docket No. 173-4.)  Beginning in February 2016, the Committee was to select, monitor, and when necessary, remove, the Plan's asset allocation.  (*Id.*, Ex. 6 at 97–98, Docket No. 173-5.)  The Committee received regular fiduciary trainings and in-house ERISA counsel attended its meetings.  (*Id.*, Ex. 9, Ex. 15 at 15, Docket Nos. 173-8, 173-13.)  Those meetings happened at least quarterly, with additional ad hoc meetings as necessary, and included formalities such as the taking of minutes.  (*Id.*, Ex. 18 at 4.)

From February through June 2016, the Committee heard and considered investment proposals from six candidates, ranking them via scorecards.  (*See, e.g.*, *id.*, Ex.

51 at 3, 5, Docket No. 173-43.)  Wells ranked at the bottom by a significant margin.  (*See* Opp., Ex. 72 at 5–7, Docket No. 179-65.)  By August, the Committee invited J.P. Morgan, T. Rowe Price, and Fidelity for finalist presentations.  (Defs.' MSJ, Ex. 17 at 23, Docket No. 173-15.)  As a non-finalist, Wells was ostensibly out of the running, though one Committee member testified the Committee "continue[d] to keep our eye on Wells Fargo."  (*Id.*, Ex. 12 at 23, Docket No. 173-10.)  The Committee agreed broadly on its priorities and selected the finalists on those criteria: a hybrid strategy, with a mix of active and passive investment strategies, and an off the shelf plan, with United-specific customization not required.  (Opp., Ex. 77 at 2, 5, 7, Docket No. 180-2; Defs.' MSJ, Ex. 12 at 23–24, Docket No. 173-10.)

The parties agree on two key points: first, when the Committee selected three finalists, Wells was not one of them; second, United ultimately awarded the contract to Wells.  How United reached the latter from the former is vigorously disputed.

### 1.   United's Story

United describes a merits-driven decision, in which it kept an open mind and found a restructured Wells investment team to be the best candidate.  Towards the end of 2016, Wells Fargo acquired Analytics Investors ("Analytics").  (Defs.' MSJ, Ex. 56, Docket No. 172-17.)  In addition, Wells changed the leadership of its asset management division.  (*Id.*, Ex. 57, Docket No. 172-18.)  When finalist presentations rolled around in April 2017, the Committee changed course to invite Wells as a "professional courtesy" and to hear out its new team.  (*Id.*, Ex. 21 at 11, Docket No. 173-18.)

The Committee was impressed with the new Wells personnel and their proposals. (*Id.* at 13–14.)  It also felt that it occupied a strong negotiating position with Wells, which allowed it to obtain a custom product at a lower price.  (*Id.*, Ex. 11 at 35, Docket No. 173-9.)

Continued bargaining resulted in the Wells factor enhanced TDF plan.   The Committee appreciated its emphasis on low volatility equities, low fees (about one third of other finalists), customized glidepath, and approach to transitioning from equal weighted to factor enhanced investing.  (*See, e.g.*, *Id.*, Ex. 25 at 21, 25, Ex. 61 at 2–3Docket Nos. 173-22, 173-51.)  The Committee also worked with Mercer to test the performance of Wells's investment proposal.  (*Id.*, Ex. 72 at 2, Docket No. 173-62.)

As to the other finalists, T. Rowe Price's and Fidelity's strategies were too aggressive, and their fees were too high.  (*See Id.*, Ex. 61 at 2–3.)  J.P. Morgan's fees were too high, and United questioned J.P. Morgan's ability to smoothly transition the Plan to a new investment strategy.  (*Id.* at 3.)

### 2.    Snyder's Story

According to Snyder, United's corporate interests infiltrated the Committee, and ultimately prevailed over the best outcome for United's employees.

As an initial matter, Snyder faults the length of the selection process.  By the time United decided to retain Wells in June 2017, it had been nearly three years since Mercer's recommendation to change providers.  Snyder's expert maintains a prudent fiduciary would have acted within months of the 2014 alert.  (Stone Rpt. ¶ 88.)

Moving on to the selection itself, there was a large, two-way business relationship between United and Wells.  United generated between $50 and $60 million in revenue from 2014–2017 as Wells's health insurance provider.  (Opp., Ex. 78 at 3–5, Docket No. 180-3.)  On the other side of the ledger, Wells provided United with substantial banking services.  (*Id.*, Ex. 44 at 3, Docket No. 179-39.)  And United was Wells's largest client and lifeline in the TDF industry.  (*Id.* at 11.)  In the balance between the two companies, the Plan constituted around 45% of the business flowing from United to Wells.  (*Id.*, Ex. 81 at 9, Docket No. 180-6.)[4]

Those business ties were not just lurking in the background of the Committee's awareness; instead, United brought them to the fore.  In Snyder's telling, the key turning point was when United's Chief Financial Officer John Rex entered the picture.  At the end of 2016, two board members stepped down from the committee.  Wilson appointed herself and Rex in their places, noting Rex's investment experience.  (Defs.' MSJ, Ex. 3 at 20, Docket No. 173-2.)

Rex was later named the "executive sponsor" of United's relationship with Wells given the "significant relationship" between the two companies.  (Defs.' Reply Supp. Summ. J. ("Reply"), Ex. 96 at 5, Sept. 15, 2023, Docket No. 191-4.)  At the November 2016

---

[4] United observes that it had even more substantial relationships with other 401(k) candidates.  For example, its balance of trade with J.P. Morgan was $320 million annually—nearly $100 million more than with Wells.  (Defs.' MSJ, Ex. 85, Docket No. 173-75.)  Nonetheless, United's most profitable relationship was with Wells, with which it had the highest net balance of trade.  (Opp., Ex. 87 at 4, Docket No. 180-11.)

Committee meeting, Rex inquired into the extent of United's business relationships with the various candidates.  (Opp., Ex. 47 at 8, Ex. 86, Docket Nos. 179-42, 180-10.)  In response, two Committee members produced a "balance of trade" fee ledger showing revenue and payments to and from the candidates.  (*Id.*, Ex. 87 at 2, 4, Docket No. 180-11.)

Consideration of United's relationship with Wells did not end with Rex.  Rather, the Committee received word that United executives, including its president David Wichmann, needed to be preemptively informed which companies would be selected as finalists.  (*Id.*, Ex. 139 at 2, Docket No. 180-62.)  A Committee member later warned of escalation to executives, including Wichmann, if Wells was not selected.  (*Id.*, Ex. 93 at 2, Docket No. 180-17.)

As if the web were not tangled enough, in March 2017—one month before the Committee held finalist presentations—Rex learned United would soon be forced to bid to retain Wells as an insurance client. (*See Id.*, Ex. 94, Docket No. 180-18.)  United finalized its decision to retain Wells on June 28, 2017.  (*Id.*, Ex. 122 at 2, Docket No. 180-45.)  Three days later, Wells opened bidding for the insurance contract.  (*Id.*, Ex. 78 at 2, Docket No. 180-3.)

Snyder contends that, around the same time Rex began inserting business considerations, Committee meetings became more insular, secretive, and procedurally irregular.  Mercer did not attend certain ad hoc meetings during the selection process,

including the finalist presentations and meetings where Wells was selected.  (*See Id.*, Ex. 22 at 22, Docket No. 185.)  Indeed, Rex instructed that Mercer should be out of the room for Committee discussions for more than two months leading up to the Committee's decision.  (*Id.*, Ex. 101 at 2, Docket No. 180-25.)  Snyder's expert claims Mercer's silo was a departure from industry norms, while United's expert maintains it was standard practice to facilitate open participation by committee members.  (*See Id.*, Ex. 22 at 22.)[5]

In addition, and contrary to past practice, United did not keep contemporaneous minutes of certain TDF selection meetings.  (C*ompare, e.g.*, *id.*, Ex. 71 at 3 (discussing a meeting on April 26, 2017), *with id.*, Ex. 57 at 4–6 (no minutes for that date).)  Further, beginning in 2017, it abandoned the scorecards that had earlier reflected poorly on Wells.  (*See Id.*, Ex. 22 at 21.)

Snyder points to other procedural clues that Wells was a poor selection.  Wells scrambled to put together its finalist presentation, evincing a level of haste that Snyder's expert says a prudent fiduciary would run from.  (Stone Rpt. ¶¶ 62, 122.)  The Committee also solicited a custom glidepath solely from Wells.  The Committee Secretary remarked that, by the time Wells's proposal came into focus, the Committee was no longer "comparing apples to apples" and suggested the Committee compare Wells's proposal to "[its] Index peers.""  (Opp., Ex. 117, Docket No. 180-40.)

---

[5] United also observes, though Snyder disputes, that Mercer remained involved in other ways and was able to provide input at key junctures.

Finally, on the merits, Snyder maintains Wells's fund was a bad choice. Her expert contends factor enhanced investing was an imprudent fad with no real track record. (*Id.*, Ex. 4 ¶¶ 58–59, Docket No. 179-4.) A prudent fiduciary would have seen the factor enhanced plan as just another underperforming pivot from Wells's past shortcomings rather than a meaningful turnaround. (*Id.*, Ex. 2 ¶ 73, Docket No. 179-2.) Nonetheless, selecting Wells's plan supported United's business interests. Snyder's expert testified that, in his 40 years advising investment funds, he has "never seen anything remotely like the [Committee's] repeated, overt consideration of business interests as part of its target date selection process." (Stone Rpt. ¶ 102.)

### 3.   Post Selection Events

Snyder points to several more troubling events following United's decision to retain Wells. The Committee's talking points cited United's stronger business relationship with Wells as a point in Wells's favor. (Opp., Ex. 128 at 4, Docket No. 180-51.) The Committee chairman later wrote "Specifically how did Wells Fargo stand out?!!" (*Id.*, Ex. 127 at 5, Docket No. 180-50.)[6] And when United ultimately lost its bid to keep Wells's insurance contract, a contemporaneous email from a Wells employee documented a call Rex placed to Wells:

---

[6] The parties debate whether the message should be read sarcastically or as a genuine expression of curiosity. The chairman enthusiastically employs punctuation in his other comments on the document. (*See generally* Opp., Ex. 128, Docket No. 180-51.) Thus, the comment may not have been as sarcastic as it appears at first glance.

> John Rex said that given what he thought was a growing
> relationship, he "stepped in front of the freight train" last fall
> to save their $5bn AUM business from leaving Wells. His team
> had "run amok, and he stepped in to save it given the growing
> WFC/UNH relationship." He is now embarrassed and wonders
> whether there is a relationship or UNH is just one of our
> Vendors.

(*Id.*, Ex. 129 at 2, Docket No. 180-52.)

Under Wells, the Plan began underperforming again in 2020. (Chalmers Rpt. ¶¶ 158–60.) Wells had shied away from technology stocks due to their historic volatility, and thus did not capture those stocks' pandemic boom. (*Id.* ¶ 162–67.) A new evaluation, commenced in 2020, led to Wells's eventual replacement with a Vanguard passive index fund TDF. (*See* Defs.' MSJ, Ex. 75 at 3, Docket No. 173-65.)

## II. PROCEDURAL HISTORY

Snyder filed a class action complaint on behalf of herself and others similarly situated for (I) breach of the duty of prudence, (II) failure to act in accordance with governing plan documents, (III) breach of the duty of loyalty, (IV) engagement in prohibited transactions, and (V) failure to monitor. (*See* Am. Compl. ¶¶ 153–202.) Because Snyder pled a prima facie case for breach of fiduciary duties by identifying meaningful benchmarks that outperformed the Plan, the Court denied United's Motion to Dismiss. (MTD Order at 12–13.) The Court later certified a class composed of participants in the Plan from April 23, 2015 through the date of judgment based on the parties' stipulation and the Court's independent review. (Order at 1–3, Feb. 2, 2022,

Docket No. 109.)  United now moves for summary judgment on all five counts.  (Defs.'

MSJ at 1, Aug. 11, 2023, Docket No. 168.)

**DISCUSSION**

**I.      STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material

fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit,

and a dispute is genuine if the evidence could lead a reasonable jury to return a verdict

for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court

considering a motion for summary judgment must view the facts in the light most

favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the nonmoving party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon

allegations, but must produce probative evidence sufficient to demonstrate a genuine

issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110,

1113 (8th Cir. 2009).

## II.    FIDUCIARY DUTIES

ERISA fiduciaries are bound by the duties of loyalty and prudence, which courts have described as the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595, 598 (8th Cir. 2009) (citation omitted).  Actions for breaches of those duties are governed by a burden shifting framework. *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994).  A plaintiff must first prove a prima facie case of breach and loss to the plan.  *Id.*; *Rozo v. Principal Life Ins. Co*, 48 F.4th 589, 594 (8th Cir. 2022).  The burden then shifts to the defendant to show the breach caused no loss because a "hypothetical prudent fiduciary would have made the same decision anyway."  *Tussey v. ABB, Inc. (Tussey I)*, 746 F.3d 327, 335 (8th Cir. 2014) (quoting *Roth*, 16 F.3d at 919).  Here, Snyder supports a prima facie case for breaches of both duties and United is unable to carry its burden to prove lack of causation.

### A.    Prudence

ERISA requires a fiduciary to carry out their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The "prudent person" standard articulated in § 1104(a)(1)(B) is objective, focusing on the fiduciary's conduct preceding or at the time of the challenged conduct.  *See Roth*, 16 F.3d at 917–18.  Under this standard, a fiduciary is obligated to undertake an independent investigation of the merits

of an investment and to use appropriate, prudent methods in conducting the investigation. *Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 906 (D. Minn. 1999).

The prudence inquiry prioritizes process over results. *See Davis v. Wash. Univ. St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020). "A prudently made decision is not actionable, in other words, even if it leads to a bad outcome." *Id.* As such, Courts are to avoid conducting a hindsight analysis; rather, the question is one of reasonableness based on what the fiduciary knew at the time. *See Tussey I*, 746 F.3d at 338; *Roth*, 16 F.3d at 918. Courts are also to look at the totality of the circumstances, not just the absolute returns of an investment. *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 703 (W.D. Mo. 2019). Typically, whether a fiduciary acted prudently is a question of fact. *Harley*, 42 F. Supp. 2d at 907 (citing *Roth*, 16 F.3d at 919).

United's prudence is best analyzed as two separate issues. First, did United act prudently when it kept the Plan's assets in the equal weighted TDF while the replacement process was ongoing for nearly three years? That question covers United's liability from the start of the class period through June 2017. And second, did United act prudently when it selected the Wells factor enhanced funds over other TDF candidates? That question covers United's liability from June 2017 onwards. There are genuine disputes of material facts on both questions.

### 1.   Retention

The duty of prudence includes a continuous duty to monitor and remove imprudent investments. *See Davis*, 960 F.3d at 484. The duty requires at least some

degree of substantive reasonableness in addition to employment of a prudent process. *Cf. Tibble v. Edison Intern.*, 575 U.S. 523, 530 (2015) ("[A] fiduciary normally has a continuing duty of some kind to monitor investments **and remove imprudent ones**." (emphasis added)).

United's primary defense is that it simply followed Mercer's advice and timeline during the 2015-2017 window.  Although that fact may ultimately serve as powerful evidence in United's favor, it is not dispositive.  To be sure, a prudent fiduciary is often required to seek independent advice.  *See Harley*, 42 F. Supp. 2d at 907.  But even though hiring outside experts "might satisfy the prudence standard" it "is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled.  It is a tool and, like all tools, is useful only if used properly."  *Roth*, 16 F.3d at 918 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983)).

United believes that both the length of the search process and the retention of the equal weighted TDFs during that time were justified by Mercer's recommendations.  But Snyder's expert disagrees.  First, her expert argues that a prudent fiduciary would have ditched the equal weighted TDFs even before the class period began, so retention thereafter was imprudent.  And second, even if Mercer initially gave prudent advice, United's fiduciaries responded imprudently to that advice.  Per Snyder's expert, a plan administrator in receipt of Mercer's 2014 memo would view it as an urgent call to action

to replace the equal weighted TDFs within months, not dilly dally for nearly three years.[7] In sum, there is a genuine dispute of material fact about how quickly a prudent fiduciary would have acted to replace the equal weighted TDFs, both because of, and in spite of, Mercer's recommendations.

United also argues that a prudent fiduciary is not required to reflexively abandon an underperforming investment. *See, e.g.*, *White v. Chevron Corp.*, No. 16-793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("[A] fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy.") Nonetheless, the reasonable length of retention and sufficiency of monitoring processes are generally fact-specific determinations that defy bright line rules. *See, e.g.*, *Tracey v. Mass. Inst. Tech.*, 404 F. Supp. 3d 356, 362 (D. Mass. 2019). The Court will decline United's invitation to hold as a matter of law that United retained the equal weighted TDFs for a reasonable length of time. Moreover, though United may not be held liable for pre-2015 events, that period may still color the Court's analysis of post-2015 retention. The Court need not blind itself to the fact that United had already held the equal weighted funds for five years and been warned of their underperformance when evaluating the reasonableness of retention by the time the class period began.

---

[7] United claims this is a bogus interpretation of the report. But where United has not taken any action pursuant to Federal Rule of Evidence 702 to disqualify the opinion, there is a material dispute over how a prudent fiduciary in the industry would respond to the memo.

In sum, there is a genuine dispute of material fact as to both the substantive reasonableness and prudence of process in United's retention of the equal weighted TDF from April 2015 through June 2017. Accordingly, the Court will deny summary judgment.

### 2. Selection

Likewise, there is a genuine dispute of material fact as to whether United employed a prudent process when it transitioned to the factor-enhanced Wells TDFs instead of selecting a new provider. Per United, it had numerous safeguards—the well-informed Committee, outside expert advice, regular meetings, and more—to ensure a reasoned decision-making process. It considered the pros and cons of the various contenders and landed with the best provider for the Plan based on the circumstances and information it had at that time. On the other hand, Snyder alleges United abandoned many of the safeguards it originally put in place (scorecards, regular attendance of Mercer at meetings, documentation of meetings, and more), resulting in an unmonitored and imprudent selection. Snyder has put forth enough evidence of an imprudent selection process to proceed to trial.

When considering the prudence of the selection process, there is inevitably some overlap with the loyalty claim. That is appropriate. After all, if the focus for the duty of prudence is the process by which a decision is reached, it is difficult to imagine how the process would be a prudent one if tainted by influences other than the Plan's best interests. *Cf. Braden*, 588 F.3d at 595–96 (jointly analyzing prudence and loyalty for an allegation that the trustee selected investment options for selfish reasons). The Court

will allow Snyder's loyalty claims to proceed, further counseling retention of her prudence claims.

### B.    Loyalty

Snyder easily meets her burden to proceed with her claim that United breached its duty of loyalty.  Loyalty claims are governed by a two-step framework: first, the reviewing court evaluates the parties' interests to determine if they conflict; if so, the court closely scrutinizes the defendant's actions to determine the defendant's mindset.  *Rozo*, 48 F.4th at 596–97.  Thus, the duty of loyalty "is a subjective standard; what matters is **why** the defendant acted as [they] did."  *In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp. 3d 868, 875 (D. Minn. 2018) (emphasis in original).  Unsurprisingly, a fiduciary's motivation is generally a question of fact.  *Rozo*, 48 F.4th at 597.

Consistent with the subjective inquiry, courts must distinguish permissible from impermissible motivations.  To be sure, "ERISA permits a fiduciary to operate in multiple roles and wear many hats."  *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 312 F. Supp. 2d 1165, 1175 (D. Minn. 2004) (internal quotation omitted).  And "incidental benefits" are "not impermissible."  *Rozo*, 48 F.4th at 595 (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 445 (1999)).  Nonetheless, "[w]hen making fiduciary decisions . . . a fiduciary may wear only his fiduciary hat."  *In re Xcel*, 312 F. Supp. 2d at 1175.  That hat requires the fiduciary to act "solely in the interest of the participants" and "for the exclusive purpose of" providing benefits to the participants.  29 U.S.C. § 1104(a)(1).  Incidental benefits must truly be incidental.  *See Rozo*, 48 F.4th at 595 (warning that

decisions benefitting the fiduciary must still "be made with an eye single to the interests of the participants" (citation omitted)).

Because United does not contest that its business relationship with Wells presents a potential conflict of interest, the Court need only examine United's motivations. Without restating the full factual background, Snyder has established a genuine dispute of material fact that United was impermissibly motivated in selecting Wells by its desire to maintain its business relationship with Wells.

Wells's rebound from non-finalist to winning bid presents strong circumstantial evidence of disloyalty.  *See Tussey v. ABB, Inc. (Tussey II)*, 850 F.3d 951, 957–58 (8th Cir. 2017) (affirming district court's weighing of circumstantial evidence of disloyalty).  Wells's comeback occurred at the same time United's CFO joined the Committee, the meeting doors closed to outside advisors, and United was preparing its bid to retain a $60 million annual contract with Wells.

And then there is the more direct evidence that United was motivated by its own interests over the Plan participants'.  Rex's request for balance of trade ledgers and his statement to Wells about jumping in front of a freight train, to name two instances, show the injection of business interests into the plan selection process.[8]

---

[8] The parties debate whether the email with Rex's statement is inadmissible double hearsay.  Though the Court will forego final resolution on the matter until trial, there is at least a plausible case the email is admissible under Fed. R. Evid. 801(d)(2), 803(6), and/or 807.  Regardless, the loyalty issue is not a particularly close call, and the Court would deny summary judgment even absent the email.

What is more, a conflicted fiduciary should take steps to alleviate the conflict.  *See Donovan v. Bierwirth*, 680 F.2d 263, 276 (2d Cir. 1982).  While *Donovan* does not go so far as to say a conflicted fiduciary must recuse, United ran headfirst into the conflict.  Rather than taking steps to shield the Committee's decisions from bias, it inserted a member who was apparently the most conflicted of all and reduced procedural checks.

United cites to various Committee members' claims that they acted solely for the Plan's benefit.  But rote recitation of the duty of loyalty does not entitle United to judgment as a matter of law.  *Cf. Harju v. Olson*, 709 F. Supp. 2d 699, 726 (D. Minn. 2010).  The testimony establishes a dispute of material fact, to be resolved at trial.

United also argues that, to the extent it considered business relationships, those prior business experiences were useful indicators of the service the candidates would provide.  That contention is belied by Rex's request for balance of trade ledgers.  If Rex simply wanted to know whether the candidates were reliable business partners who would answer the phone when called, it is hard to see how knowing the exact dollar amounts of business with the firms would be necessary.

Finally, United argues that the fact it was not ultimately awarded Wells's insurance contract shows there was no quid pro quo.  The fact that United did not ultimately keep Wells's business does not resolve its pre-bidding motivation, especially considering Wells reached a decision after United renewed its Plan with Wells.  Rex may have still been motivated by the potential contract and simply miscalculated.  The law often punishes

attempted misfeasance the same as completed misfeasance.  *Cf., e.g.*, 18 U.S.C. § 1349.

A failed bid to use the Plan as a bargaining chip would still violate the duty of loyalty.

### C.    Causation

With Snyder proving a prima facie case of breach,[9] the burden of persuasion shifts

to United "to prove that the loss was not caused by . . . the breach of duty."  *Roth*, 16 F.3d

at 917 (quoting *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992)).  The inquiry is one of

objective prudence: There is no causal link between an alleged breach of fiduciary duty

and an investment loss if a hypothetically prudent fiduciary would have made the same

investment.  *Id.* at 919.  "[T]he causal connection between breach and loss, like breach

itself, is a fact-intensive inquiry" not easily "susceptible to summary judgment."  *Id.*

The Eighth Circuit requires ERISA defendants to clear a high bar to prove objective

prudence.  S*ee Harley*, 42 F. Supp. 2d at 905–06 (quoting *Martin*, 965 F.2d at 671–72)

(Courts do not "take kindly to arguments by fiduciaries who have breached their

obligations that, if they had not done this, everything would be the same."); *accord Tatum*

*v. RJR Pension Inv. Comm.*, 761 F.3d 346, 364–66 (4th Cir. 2014) (warning against

"diminish[ing] ERISA's enforcement provision to an empty shell" by setting the objective

prudence bar too low).

For many of the reasons stated in the prudence and loyalty sections, there is a

genuine dispute of material fact as to whether a prudent fiduciary would have reached

---

[9] Prima facie loss is not contested.

the same outcome in both retaining the equal weighted TDFs and selecting the factor enhanced TDFs.  As to retention, Snyder's expert maintains a prudent fiduciary would have replaced the equal weighted TDFs before the class period even began.  There is also a dispute as to whether United's risk minimization strategy was prudent—Snyder introduces evidence that the risk minimization strategy prioritized the wrong kinds of risks and overly sacrificed returns.  Same as to selection, where Snyder's expert argues a prudent fiduciary would not have bought into the factor enhanced fad and would have abandoned Wells's lagging TDF practice.  In fact, the Court almost has the exact counterfactual before it: In the initial parts of the selection process that Snyder does not fault, the Committee landed on three finalists other than Wells.  Of course, United raises other counterarguments (e.g., Wells's lower fees) but those all merely present material fact disputes to be resolved at trial.

United also claims that Snyder overly relies on hindsight analysis in faulting the Wells investments.  But Snyder has introduced sufficient evidence of real time information, including Mercer's quarterly reports, to create a genuine dispute as to whether a prudent fiduciary would have replaced the Wells TDFs based on the information United had at the time.  *See Harley*, 42 F. Supp. 2d at 915–16.

In sum, Snyder has proven prima facie claims of prudence and loyalty violations, and United has not overcome the prima facie showing with objective prudence.

-24-

III.     GOVERNING DOCUMENTS

29 U.S.C. § 1104(a)(1)(D) requires a fiduciary to act "in accordance with the documents and instruments governing the plan."  United contends that Count II, alleging a violation of that duty through noncompliance with the IPS, is inappropriate because (1) as a matter of law, there can never be an ERISA violation for contravention of an IPS, and (2) United did not violate the IPS here.  Though the Court disagrees with United's first contention, it will grant summary judgment for United on Count II because United did not violate any enforceable provision of the IPS.

A.     Legally Cognizable

United's first argument is broad, claiming that voluntary IPS statements are not "governing" plan documents.  *See* 29 U.S.C. § 1104(a)(1)(D).  Per United, because only breach of a governing document violates ERISA, and IPS statements are not governing, they can never underly an independent cause of action.  *See id.*  To carve out IPS's specifically from ERISA's commands, though, would prioritize the labeling of a document over the substance within.  Accordingly, many courts have found a fiduciary's failure to follow an investment guidance document provides independent grounds for liability.  *See, e.g.*, *Dardaganis v. Grace Cap., Inc.*, 889 F.2d 1237, 1241 (2d Cir. 1989).

United points to *Tussey I*, in which the Eighth Circuit expressed concern that "construing all investor policy statements as binding plan documents will discourage their use."  746 F.3d at 334 n.5.  Although the Eighth Circuit "question[ed]" whether an IPS "informally implemented to provide a framework for administering the plan" could

constitute a binding plan document, the court explicitly reserved judgment on the question. *Id.*

Ultimately, a legal rule that all IPS statements are not within ERISA's purview is neither compelled by precedent nor appropriate. Rather, whether any document—including an IPS—is a "governing" document should be determined by examining the document in question. The Court may consider whether the IPS "control[s], direct[s], or strongly influence[s] the actions and conduct" of the Plan or otherwise "exert[s] a determining or guiding influence in or over" the Plan. *See Govern*, Merriam Webster Online, https://www.merriam-webster.com/dictionary/govern (last visited Mar. 4, 2024). If the circumstances establish that a document is "governing," a fiduciary's duty to administer the Plan in accordance with the document takes on statutory importance. *See* 29 U.S.C. § 1104(a)(1).

Here, United's IPS is a "governing" document. Though many parts of it are not binding, certain provisions establish enforceable rules for Plan governance. For example, it provides that the fiduciary "will examine" certain criteria when selecting investment funds and mangers and "will adhere" to a measurement and evaluation process. (IPS at 7.) Accordingly, the issue is whether United violated any duties established by the IPS.

### B. IPS Violation

United is not liable for violating the IPS because it did not breach any enforceable provision of the document. Snyder points to two potential breaches of the IPS. First is the "Criteria for Review or Replacement." (IPS at 24.) That provision is not definite

enough to be enforceable.  *Cf. Hunt v. IBM Mid Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 857 (Minn. 1986) (indefinite policy statements are unenforceable); *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001).   The replacement guidelines are "intended to provide a reference regarding factors that would give rise to further due diligence" and "may indicate a need to review the selection."  (IPS at 24.)  Nowhere does it specify how the fiduciary is to weigh the various factors, nor if the fiduciary must consider all of them.  And if the fiduciary "has concerns regarding any of the criteria or the overall effectiveness of a fund or manager," certain "step(s) may be taken," including replacement.  Read as a whole, this provision requires nothing of the fiduciary; rather, it simply "provide[s] a reference."  (*Id.*)  It is too indefinite to allow for judicial enforcement.

Second is the "Criteria for Selection of Investment Funds or Investment Managers." (*Id.* at 7.)  When selecting an investment manager, the fiduciary "will examine" certain criteria.  (*Id.*)  Because the language is mandatory, this provision is more definite than the replacement provision.   Notwithstanding the enforceability of this provision, the examination requirement is a low bar to clear, and the criteria to examine are quite basic: firm quality and depth, adherence to the Plan's investment approach, diversification, performance and risk, and fees.  (*See id.*)  The record establishes that the Committee

examined these broad criteria in its selection process for the factor-enhanced funds.[10] And though Snyder believes United reached the wrong conclusions on the criteria, the IPS only requires an examination.

Accordingly, because there is no genuine dispute that United did not violate its IPS, the Court will grant United's motion for summary judgment as to Count II.

## IV.    PROHIBITED TRANSACTIONS

ERISA prohibits fiduciaries from engaging in certain transactions.  *See* 29 U.S.C. § 1106.  Included are transactions in which a fiduciary deals with plan assets for their own interest or account.  *Id.* § 1106(b)(1).  The parties do not dispute whether United's retention of Wells violated § 1106(b)(1).  Rather, the issue is whether 29 U.S.C. § 1108(b)(8) provides United safe harbor from the transactional prohibition.  Section 1108(b)(8) blesses what would otherwise be prohibited transactions if, as relevant here, the transaction is with a regulated bank that "receives not more than reasonable compensation."

As a threshold matter, the Court agrees with the analysis in *Feinberg v. T. Rowe Price Grp., Inc.*, that § 1108(b)(8) may provide safe harbor for § 1106(b) prohibited transactions.  No. 17-427, 2021 WL 488631, at *12 (D. Md. Feb. 10, 2021); *see also* U.S. Dep't Lab. Adv. Op. No. 2005-09A at 5, 7 & n.2 (May 11, 2005) (opining the same).

---

[10] United's 2010 selection of the equal weighted TDFs predate both the class period and ERISA's six-year statute of limitations and thus is not subject to review.  *See* 29 U.S.C. § 1113.

-28-

With § 1108(b)(8)'s exemption available as a matter of law, the question becomes whether Wells's fees were, in fact, reasonable.  United bears the burden of proving that Wells's fees were reasonable.  *See Rozo*, 48 F.4th at 599.  Here, there is a genuine dispute of material fact in the dueling expert reports.  United's expert opines that Wells's fees were in line with that of other TDF providers' fees.  But Snyder's expert counters that United makes meaningless "apples to oranges comparisons" by comparing the Wells TDF—which received the favorable pricing of a large institutional plan—to more expensive public mutual funds.   (Opp., Ex. 4 ¶¶ 50–53.)  The methodological deficiencies Snyder's expert identifies would be sufficient for a reasonable factfinder to find United has not satisfied its burden to prove that Wells's fees were reasonable.

## V.      INDIVIDUAL DEFENDANTS

United's Board of Directors and its President, Wichmann, contest their individual liability in this action.  The threshold question in an ERISA case is whether the defendant was acting in a fiduciary capacity.  *Trs. of the Graphic Commc'ns v. Bjorkedal*, 516 F.3d 719, 732 (8th Cir. 2008).  Because Wichmann and the Board were not named fiduciaries of the Plan, liability would only attach if they were functional fiduciaries.  29 U.S.C. § 1102(a); 29 U.S.C. § 1002(21)(A).  There is a genuine dispute as to whether Wichmann exercised discretionary authority or control over the plan, and thus acted as a fiduciary.  *See* 29 U.S.C. § 1002(21)(A).  The Board, however, exercised no control and had no duty to monitor the Plan, so the Court will grant summary judgment for the Board on all counts.

### A.   Wichmann

An individual acts as a functional fiduciary to the extent they "exercise[] any discretionary authority or discretionary control respecting" the management of the plan, the distribution of its assets, or the plan's administration.   29 U.S.C. § 1002(21)(A); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016).

Though a close call, the Court finds under a summary judgment standard that Wichmann was a § 1002(21)(A) fiduciary.  In an email shortly before the 2017 selection, a Committee member referenced the "likely escalation" to DSW—David S. Wichmann— "if Wells does not get selected." (Ex. 93 at 2.) There is a reasonable inference to be drawn from the email that Wichmann exercised an implicit veto over the TDF selection process and thus exercised discretionary authority.  Of course, the email may have simply been referencing Wichmann's potential displeasure after the selection, even if he did not have power to influence the selection itself.  But those competing inferences should be aired out at trial.  Accordingly, the action may proceed against Wichmann.

### B.   Board of Directors

To begin, the Court sees no evidence that United's Board of Directors exercised any discretionary authority or control over the Plan.  The Court will thus dismiss Counts I-IV against the Board because it owed no fiduciary duty.

The only remaining question is whether the Board had a duty to monitor the Plan, as alleged in Count V.  The duty to monitor is narrow and requires only that a fiduciary monitor its appointees.  *See In re Xcel*, 312 F. Supp. 2d at 1176.  Although the Board

appointed Wilson as the Plan's fiduciary, no monitoring duty attached to that appointment. Employers do not act as fiduciaries when they "adopt, modify, or terminate" a benefit plan. *See Hughes*, 525 U.S. at 443–44 (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)). And one of the required steps to establish an ERISA plan is to appoint one or more fiduciaries. 29 U.S.C. § 1102(a). Thus, the Board owed no duty to monitor because it was not acting as a fiduciary when it appointed Wilson. As United observes, a holding to the contrary would also subject any board of directors that ever establishes an ERISA plan to continuous monitoring liability. Accordingly, the Court will dismiss Count V as to the Board, relieving the Board and its members of all liability in this action.[11]

## CONCLUSION

Snyder has uncovered sufficient evidence to proceed on her fact-bound claims that United acted imprudently and disloyally when it retained and re-selected Wells as the Plan's default TDF provider. There is also a genuine dispute of material fact as to whether Wells's funds were reasonable. At the same time, Snyder has not shown that United violated any enforceable provision of a governing plan document, so Count II will be dismissed. And the Board will be dropped from this action altogether because its

---

[11] United moves for summary judgment on Count V as to all other defendants because the duty to monitor is a derivative claim that requires an underlying breach. *See Wildman*, 362 F. Supp. 3d at 711. Because Snyder's prudence and loyalty claims will proceed, so too will her monitoring claim against the remaining defendants.

members were not Plan fiduciaries.  This case will be placed on the Court calendar's next

available trial date.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 168] is

**GRANTED in part and DENIED in part** and The Board of Directors of UnitedHealth Group,

Inc. and its members are **DISMISSED** as defendants in this action.


DATED:  March 12, 2024
at Minneapolis, Minnesota.

                                                  JOHN R. TUNHEIM
                                      United States District Judge